JOSEPH J. O'DONOHUE *et al.*, Appellants, *v.* FRANCIS H. LEGGETT *et al.*, Respondents.

*Supreme Court, First Department, General Term, December 2, 1889.*

1. *Sale. Executory.*—A deficiency in the quantity, though marked upon the inclosure, where knowledge thereof in the purchaser is not shown, does not deprive him of the right to object on this ground when discovered, notwithstanding he put his refusal to accept upon the fact of defect in the quality.
2. *Same.*—Where plaintiff's assignors sold to defendants, through brokers, a certain quantity of " Free Preanger " coffee to arrive, which defendants, on arrival, refused to accept on the ground that it was not such coffee, and plaintiff introduced evidence to show that in the trade " Free Preanger " had another than a literal meaning, but the custom was not shown to be general, it was held that the complaint was properly dismissed.
3. *Evidence. Contract.*—Proof may be given to show that words and phrases, employed in a contract of sale, were used with a meaning different from their common signification, and so understood.
4. *Same. Custom.*—Where a contract is clear and definite, evidence of custom, or usage, to change or vary it, cannot be legally received.
5. *Witnesses. Impeachment.*—A party cannot introduce evidence to sustain the reputation and standing of his witnesses before they have been assailed by impeaching evidence.

Appeal from judgment dismissing complaint.

Action to recover damages for a breach of contract of sale. This action has been twice tried, the first trial resulting in a verdict for plaintiffs, which was reversed by this court. The second trial resulted in a dismissal of the complaint granted on a motion based on the grounds that plaintiffs

failed to fulfill the contract in not delivering the quality contracted for, and that the coffee tendered was not sufficient in quantity.

The appellant on this appeal claims that the question whether the coffee which was tendered was the kind defendants had in mind and intended to buy, should have been submitted to the jury ; that the court erred in dismissing on the ground of failure of proof of delivery of a sufficient quantity; that the court erred in rejecting evidence of usage in respect to sales of coffee in round numbers of piculs tending to show that the difference in respect to quantity when not greater than claimed by the defendants in this case did not constitute shortage within the meaning of the contract ; that it was error to exclude testimony offered by plaintiffs to show that, according to the custom of coffee dealers, complaint of shortage should be made within a certain time, in default of which a waiver would be considered, and that the court erred in dismissing the complaint on the ground of shortage in delivery, because the proof showed waiver by the defendants of shortage, if any.

The opinion rendered on the former appeal is as follows :

DANIELS, J.—The verdict was rendered for the difference between the price for which certain coffee was agreed to be purchased by the defendants and that which it produced upon a sale made after they had refused to accept and receive it.

The contract for the sale of the coffee was in writing and made by brokers with the defendants on account of Sheldon, Banks & Co., who had previously agreed to purchase the coffee from the plaintiffs. After the defendants refused to receive it, the right of their vendors to recover damages for the non-performance of the agreement was assigned to the plaintiffs, and the action was prosecuted by them against the defendants as such assignees. The contract was made on the 27th of October, 1879, and it was in the following form :

"NEW YORK, *October* 27, 1879.

"Sold for account of Messrs. Sheldon, Banks & Co., to Messrs. Francis H. Leggett & Co., 1,700 piculs Free Preanger coffee to arrive, name of vessel or vessels to be given as soon as known to sellers, at twenty-two cents per pound. Sound and made sound. Basis, four months' notes from average delivery in the store. Payable cash as received within first month's storage. Discount for unexpired term. Rate, seven per cent. per annum. First month's storage and fire insurance free, and to weigh coffee. Should government impose a duty on coffee, this coffee to be taken in bond. No arrival no sale.

"(Signed)

"O'SHAUGHNESSY & SORLEY, *Brokers*.

"O'SHAUGHNESSY & SORLEY, 97 Wall street."

(Written across face) "Accepted: Sheldon, Banks & Co."

The coffee was laden on board the ship *Jacobus Johannes*, which was afterwards offered by vendors to defendants in fulfillment of the terms of the contract.

The ship arrived at the city of New York prior to the 6th day of May, 1880, and the coffee was then placed in store.

It was not, however, what was in fact "Free Preanger" coffee, but it was a coffee accurately known as "Pondok Gedeh." The former description was coffee produced upon free estates in the province of Preanger, situated upon the south-westerly portion of the island of Java. This province was separated by a mountain range from that called "Buiten-zorg," which contained the estates producing the Pondok Gedeh coffee.

That which was offered to the defendants was not in fact Free Preanger coffee, therefore, and for that reason they refused to accept it in performance of the agreement which they had made. To obviate this objection, proof was given at the trial that at the time when the agreement for the sale and purchase of the coffee was executed, what was, in fact, Free Preanger coffee, or coffee grown upon free estates

in the province of Preanger, was an article not, in fact, dealt in at the city of New York, but that other descriptions of coffee produced in the province of Buitenzorg were dealt in under the name and description of "Preanger" and "Free Preanger" coffee. The coffee so dealt in under these names was stated to be the product of Pondok Gedeh, Nangoon and Tziserora, and evidence was given tending to establish the fact that these were the descriptions of coffee bought and sold under the name of "Free Preanger" or "Preanger" coffees and that the defendants, previous to the making of the agreement in suit, had in one or more instances been parties to such dealings. This evidence was not so definite as to be conclusive upon the parties to the agreement, but it probably was sufficient, if it were admissible, to warrant the court in submitting the point to the jury whether, in making their agreement, the parties had used this phrase in the sense alleged to have been acquired by it among dealers in coffee in the city of New York; and it was so submitted by the court to the jury, and the defendants' liability on this part of the case made dependent upon the intention of the defendants to buy the coffee of the quality and description tendered to them in performance of the agreement.

That evidence was admissible to prove that the phrase "Free Preanger coffee," had acquired a fixed and definite meaning in the coffee trade, differing from its obvious meaning in the city of New York prior to the time when this agreement was made, seems to be reasonably free from controversy; for, in the course and transaction of business, words and phrases may acquire an important signification, differing from that attributed to them in their common use, and proof of that fact may be given to show that they were so used and understood, and where the proof establishes that to be the fact, the terms employed are so to be understood and applied in the determination of legal controversies affecting agreements containing them. In Irwin *v.* Williar,

110 U. S. 499, the signification of the phrase "dealing in grain," as it was used in a copartnership business, was made the subject of consideration by the court. The phrase itself was one concerning which no confusion of meaning could ordinarily arise, for the words employed in it were those of common and known signification; yet the court in that case held it to be proper to receive evidence tending to establish the fact that in the business in which these words had been employed they had acquired a special, limited, trade signification. On that subject it was said in the opinion that "dealing in grain" is not a technical phrase from which a court can properly infer, as matter of law, authority to bind the firm in every case, irrespective of its circumstances, and, if by usage it has acquired a fixed and definite meaning as a word of art in trade, that is matter of fact to be established by proof and found by a jury. Id. 506. The same subject was considered in Bissel *v.* Campbell, 54 N. Y. 353, where it was said that "general words in particular trades and branches of business, as among merchants, for instance, may be used in a new, peculiar, or technical sense, and therefore, in a few instances, evidence may be received from those who are conversant with such branches of business, and such technical or peculiar uses of language, to explain and illustrate it." Id. 357. And in Collender *v.* Dinsmore, 55 Id. 200, it was also held that words or forms of expression which are not of universal use, but are purely local or technical, may be explained by parol evidence, and the same is true of words or phrases having two meanings, one common and universal and the other peculiar, technical or local. Id. 205.

The evidence by which this local signification was attributed to these words was not very substantial or satisfactory in its character, for the witnesses by whom it was given were able to recall but few instances in which these other descriptions of coffee had been delivered and received as Preanger coffee, and before the contract in suit was entered

into, the authenticated instances in which the phrase
Preanger coffee was used appear to have been exceedingly
limited. The first clearly and satisfactorily shown was in
September, 1879, and alone necessarily entitled to but little
weight in the way of establishing a different signification
for this phrase from that which in fact it should truthfully
receive. This evidence was also reduced in its effect by
the testimony of the plaintiffs' witnesses stating their own
understanding of the phrase Free Preanger coffee.

The agreement for the sale was made through the agency
of the firm of brokers known as O'Shaughnessy & Sorley.
The member of the firm directly participating in it was Mr.
Sorley, and he stated in his evidence : " When the term
Preanger is used alone, I understand by that government
coffee raised in the Preanger district."

The witness Christiana expressed himself in a similar
manner, for he stated : " When I hear the name Free
Preanger, I understand by it, in the trade, coffee grown in
the district of Preanger."

Peter J. O'Donohue, who was one of the firm selling this
coffee to the defendant's vendors, gave evidence of a like
import. He was asked : " What does Preanger mean ?
A. It is coffee raised on the island of Java, in the Preanger
region ; that is what we understand by it in the trade.
Q. And when you buy Preanger coffee you expect coffee
raised in Preanger ? A. Yes, sir ; the general expectation."
O'Shaughnessy, the other member of the firm, was also ex-
amined as a witness in the case on behalf of the plaintiffs,
and testified that a sale made by his firm for Wheeler & Co.,
to the defendants, on the 22d of September, 1879, was their
first transaction in coffee referred to as " Free Preanger
Coffee." The evidence of the plaintiffs' witnesses also
tended to show that this particular contract was made for
what was in fact Free Preanger coffee. Mr. Sorley stated
that " in the sale to Leggett & Co., I represented the
coffee to be Free Preanger." And O'Shaughnessy, the

other member of the firm, testified that, in the sale in September to the defendants, he represented the coffee sold to them as Free Preanger, and that he made the same representation to their vendors, when the contract of sale was made of this coffee to them. All this evidence tended very decidedly to deprive the other testimony, as to the local understanding of this phrase, of its force in the case, but still it may have been sufficient to sustain the direction by which the jury were allowed to determine whether the phrase had acquired a different meaning among dealers in coffee in the city of New York from that which would be accurately attributable to it.

Other proof of usage of custom was also allowed to be given tending to establish an obligation on the part of the defendants to reject the coffee, if they intended to object to its quality or description, within twenty-four hours after the samples were delivered to them. But for the reason and under the authorities hereafter stated, this proof probably could not legally be allowed to produce such a result, for by the terms of the agreement the time when the coffee was to be delivered was definitely designated and the defendants could not well be required to conclude themselves upon that subject before the coffee itself in bulk arrived. That was the proper time stated by Mr. Sorley for its examination, and the order requested by the defendants for liberty to sample the coffee, and the authority returned to the defendants to do that, proceed upon this understanding of the agreement. It was by neither side pretended that the defendants had precluded themselves from objecting to the coffee by anything which had previously transpired, but liberty was asked and accorded for the examination of the coffee, to enable the defendants to determine whether they should take it or not; and it is quite significant, upon a point to be considered, that in their request for this liberty, and that made by their vendors upon the plaintiffs, the coffee was stated to be in quantity the same as was mentioned in

the agreement. By the terms of the agreement the vendors obligated themselves to deliver the coffee mentioned in it after the arrival of the vessel ; and, as the defendants did not in fact accept it before that time, there seems to be no legal ground preventing them from objecting to it when it was tendered to them after the vessel had arrived and the coffee had been placed in store. The custom or usage relied upon to defeat this right does not seem to have been sufficient for that purpose, for the clear implication of the agreement was that the defendants were free to act after the coffee was in port, and there seems to be no principle upon which they could be deprived of that right by the indefinite and uncertain evidence relied upon as establishing a different usage in this trade.

It is not necessary, however, definitely to determine either of these points for the disposition of these appeals, for the coffee which was offered to the defendants by way of performance of the agreement was materally deficient in quantity. Tho contract was for the sale of 1,700 piculs, while that which was unladen from the ship amounted only to 1,645.50 piculs. A picul was shown to contain 136 lbs. The amount offered to the defendants under the contract was accordingly over 7,000 lbs. less than that which they agreed by its terms to purchase. This was not known to them when they were offered the coffee after the arrival of the ship. The offers of the coffee was made to them during the months of May and the early part of June, 1880, and the coffee itself was not weighed until the 5th or 6th of June, and information of its precise weight was not even then communicated to the defendants. It did not appear, consequently, at the time when they refused to accept the coffee for the reason that it was " Pondok Gedeh " and not " Free Preanger," that it was deficient in quantity.

In or about the month of February, 1880, bags containing samples of the coffee, which had been sent overland after its shipment, were delivered to the defendants for their inspec-

tion and examination, and these bags had figures upon them which indicated that there was this deficiency in the quantity of the coffee, but they do not appear to have been observed either by the defendants or Mr. Armitage who was in their employ conducting their business, and in, the written requests made by the defendants on the 8th of May, and by Sheldon, Banks & Co. for authority to the former to sample the coffee, the quantity was stated the same as it had been in the agreement indicating that to be the amount they expected to receive.

No such knowledge, therefore, can be held to have been acquired either by him or the defendants as would deprive them of the right to object to this deficiency in quantity. The fact first appears to have been brought to their attention upon the trial of this action.

It was alleged in the complaint that the vendors offered and tendered all the coffees described in the contract. This was denied by the answer, and the obligation rested upon the plaintiffs to prove the truth of these allegations before they could recover in the action. They failed to do that because of the deficiency in quantity, but they endeavored to relieve themselves from the effect of this inability to prove the performance of the agreement by a further proof of custom. For that purpose evidence was given tending to show that, in cases of coffee to arrive, the exact quantity was not always realized, but that it overran in some cases and fell short in others, and that when 1,640 piculs would arrive, it would be regarded as a good delivery upon a contract for 1,700.

This evidence was objected to as incompetent, immaterial, and seeking to vary the contract. The objections were overruled and the defendants excepted. The exceptions taken to the rulings allowing this evidence to be introduced in the case were legally well founded, for there was nothing uncertain or indefinite in the contract in this respect. It

was, on the other hand, a positive agreement to deliver 1,700 piculs of coffee.

The contract was in no way indefinite or qualified as to the quantity, but the sellers by means of it undertook to deliver this quantity, and their contract could not be legally performed by delivering that amount, as there was no waiver on the part of the defendants to the right to demand full and complete performance of the agreement.

Where a contract is clear and definite as this was in this respect, evidence of custom or usage to change or vary it cannot be legally received. Fellows *v.* Mayor, 17 Hun, 249; Westcott *v.* Thompson, 18 N. Y. 363 to 367; Bradley *v.* Wheeler, 44 Id. 495 to 504; Corn Exchange Bank *v.* Nassau Bank, 91 Id. 74 to 82; Partridge *v.* Insurance Co., 15 Wall. 573 to 576; Collender *v.* Dinsmore, *supra.*

Without this evidence the plantiffs' proofs would have been materially deficient; it consequently had an important bearing upon their right to recover in the action, so important as to have justified the court in withholding all inquiry from the jury concerning this deficiency in the quantity of the coffee.

In the course of the cross-examination of witnesses produced on the defense, evidence was elicited, subject to the objection and exception of the defendants' counsel, showing the reputation of the plaintiff's witnesses, Sorley and McNulty, had not been assailed in any manner by proof affectin gtheir standing or reputation either as business men or men of integrity, and it was not competent for the plaintiffs, as long as that was the state of the proof, to endeavor to sustain them by evidence showing their reputation and standing to be good. Hannah *v.* McKellip, 49 Barb. 342. This evidence may not have had any important influence in the determination of the case by the jury, but there is nothing contained in it which would justify the conclusion that it produced no legal injury to the defendants.

As the case was presented, the right of the plaintiffs to maintain the action was not made out by legal evidence.

The judgment and order must consequently be reversed and a new trial directed, with costs to abide the event.

DAVIS, P. J.—I have grave doubts of the conclusion of my brother Daniels as to the question arising from the failure to tender 1700 piculs coffee and the showing of a tender of 1640 piculs. No objection was made on that ground at the time of the tender or offer to deliver. It seems to have been assumed that the quantity was sufficient, but that defendants were not bound to receive the coffee, because the kind tendered was not the kind purchased. I think the contract under the circumstances should not be held to be one for a definite and absolute quantity. Such a holding would defeat an action if a single picul short of 1700 was tendered. The quantity sold was doubtless understood to be that on board of a ship or ships to be afterward named. It was sold to arrive, and when the naming of the vessel or vessels was afterward supplied, the fair import of the contract was, I think, an agreement to sell and deliver the coffee of the kind mentioned then on board such vessel or vessels. The naming of 1700 piculs would, in that case, perhaps fix the maximum, and the defendants would be bound to take it, for the whole contract taken together should be understood to be that the quantity that should arrive being about 1700 piculs, and not exceeding that number was sold.

I think the defendants ought not to have been permitted to make the point of deficiency for the first time on the trial.

I am, however, satisfied with the disposition of the case on the other points discussed by DANIELS, J., and must concur in a reversal and a new trial.

*J. H. Choate,* for appellant.

*J. B. Lord*, for respondent.

PER CURIAM.—A. consideration of this case leads to the conclusion that the questions presented are sufficiently covered by the opinion delivered upon the former appeal.

An examination of it did not disclose the existence of any additional facts or circumstances requiring a different disposition than that mentioned and therefore the judgment should be affirmed, with costs.

VAN BRUNT, P. J., BRADY and DANIELS, JJ., concur.